**KOLAR, INC.**

v.

**The UNITED STATES**

No. 195–78.

United States Court of Claims.

May 20, 1981.

Jeffrey L. Willis, Phoenix, Ariz., attorney of record, for plaintiff; Robert E. B. Allen, Streich, Lang, Weeks & Cardon, Phoenix, Ariz., of counsel.

Elizabeth Langer, Washington, D. C., with whom was Acting Asst. Atty. Gen., Thomas S. Martin, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Judge:

This government contract case is presently before the court on Count Two of plaintiff's petition which claims that defendant is liable to plaintiff for breach of contract. The specific breaches which are pleaded are breaches of an alleged warranty that guaranteed the description of the property, part of which was described as "demilitarized practice bombs," and an alleged warranty that the plaintiff could safely use cutting torches on the property.

Plaintiff was the successful bidder on a contract to purchase surplus property from the Defense Property Disposal Service. Item 3 of the invitation for bids, made a part of the contract, involved the purchase of certain scrap metal located at Gila Bend Air Force Auxiliary Field, Gila Bend, Arizona. That scrap metal was described as:

> MISCELLANEOUS METALS, SCRAP: Including steel and aluminum, with other ferrous, nonferrous and nonmetallic attachments including vehicle residue; tow target residue; demilitarized 10 lb, 25 lb, 500 lb, 750 lb and 2000 lb practice bombs, aluminum from Napalm bombs and aerial flares. Approx. 50 per cent of the 500, 750, 2000 pound bombs are filled with cement. Bombs containing sand may be emptied on site.

The 670 gross tons of scrap metal at Gila Bend was debris from bombing practice by the U.S. Air Force.

In May 1972, preparation of the Gila Bend Field for the removal of expended munitions by a civilian contractor began. Air Force personnel initially cleared the scrap metal from one target area but the excessive amount of time expended resulted in a decision to contract for the clearing of the remainder of the field. Prior to contracting for the clearing of the field, Air

Force personnel engaged in a "blow and go" procedure whereby explosive material which remained on the Eastern Tactical Gunnery Range (East Tac) at Gila Bend Field was exploded and then marked with black paint to signify that it had been inspected for explosive charges. Specifically, Air Force personnel were inspecting the practice bombs on the range for spotting charges. A spotting charge is an explosive device which, when installed in a practice bomb, is designed to create a visible cloud or spot upon detonation, indicating to the pilot of an aircraft or other spotter where the bomb hit.

In August 1974, a contract to stockpile the scrap metal was awarded to J&W Construction. J&W Construction cleared the remainder of the expended munitions from the East Tac range and stockpiled it with the material which the Air Force personnel had cleared in 1972.

On April 10, 1975, plaintiff was awarded Contract No. 41–5448–017 for the purchase of the scrap metal at Gila Bend for a total price of $49,580. Plaintiff began the salvage operation on May 21, 1975. Shortly after commencing operations, while cutting torches were being used on the scrap, one of the practice bomb casings being cut by a torch exploded, killing one of Kolar's employees and seriously injuring two others. The following day, the Government withdrew the scrap metal at Gila Bend from the contract. The entire contract price, plus $100 for the performance bond, was refunded to plaintiff.

Kolar originally filed suit against the United States in United States District Court for the District of Arizona. That action was dismissed for lack of subject matter jurisdiction on November 15, 1977, *Kolar, Inc. v. United States*, No. CIV 77–434–PHX–WPC (D.Ariz., petition filed June 2, 1977), and an appeal is pending before the Ninth Circuit, *Kolar, Inc. v. United States*, No. CA 78–1490 (9th Cir., filed in 1978).

The present suit was filed in this court on May 4, 1978, and invokes our jurisdiction under the Tucker Act, 28 U.S.C. § 1491

(1976). The case is presently before the court on cross-motions for partial summary judgment. After careful consideration of the briefs and other submissions to the court, and oral argument, we conclude that the plaintiff is not entitled to contract damages on the breach of warranty theory which is presently before the court under Count Two of the petition.

As this court stated in *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 699 (1964):

> * * * In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue. * * * [Citations omitted.]

This statement relating to warranties was quoted by the court in *Paccon, Inc. v. United States*, 185 Ct.Cl. 24, 27–28, 399 F.2d 162, 166–67 (1968), and is relied upon by the plaintiff in this case as a definition of warranty. In order to prevail on its pending motion, the plaintiff must establish that (1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue.

## PLAINTIFF'S WARRANTY CLAIMS

Plaintiff has two claims of warranty in this case. The plaintiff claims that the Government warranted that cutting torches could be safely used to prepare the material sold under the contract. Secondly, the plaintiff claims that the Government warranted that the material sold was demilitarized, and since the material was not demilitarized, the Government breached the guaranteed descriptions clause of the contract. Alternatively, plaintiff claims that the misdescription of the material as demilitarized was a misrepresentation by the Government.

### Cutting Torches

■ Plaintiff's first claim is that the defendant warranted that cutting torches could be safely used. The warranty is allegedly contained in the portion of the contract which is captioned Loading Table. That page of the contract refers to the general contract clause, entitled Delivery, Loading, and Removal of Property, and states that the purchaser of the scrap at Gila Bend must load the material itself and adds several notes, including the following:

C. Purchaser will be permitted to provide a one man guard at the work site, 24 hours a day, 7 days a week, to secure and oversee the purchaser owned equipment and the material. Purchaser may also bring to work site equipment to prepare the material for ease of loading and transporting such as cutting torches and a metal baler.

D. Purchasers are cautioned that preparation and handling of the property may be hazardous. Purchasers must ascertain all facts as to the potential dangers and enforce all applicable fire and safety regulations during the performance of the contract.

The foregoing provisions cannot reasonably be read as plaintiff claims. Note C merely gives permission to the contractor to bring certain equipment to the work site. Note C gives permission to use cutting torches to prepare material for ease of loading. At most it can be read as saying: "The purchaser may use cutting torches." This permissive use put the risk of determining when use of cutting torches would be appropriate on the plaintiff. *See Chris Berg, Inc. v. United States,* 182 Ct.Cl. 23, 28–30, 389 F.2d 401, 404–06 (1968). Note C does not guarantee or assure plaintiff that cutting torches can be safely used on practice bombs or on any of the other scrap metal involved herein. Note D specifically rebuts the plaintiff's contention by warning the plaintiff that the material may be hazardous, and specifically requires the purchaser to "ascertain all facts as to the potential dangers." When these loading provisions are read as a whole and given a reasonable meaning, as they must be, *Monroe M. Tapper & Assoc. v. United States,* 221 Ct.Cl. ——, ——, 602 F.2d 311, 315 (1979); *Hol-Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972 (1965), we can only conclude that the defendant did not assure the plaintiff that cutting torches could be safely used on the practice bombs. The Government gave no warranty, and plaintiff was under a duty to analyze the potential dangers for itself. When the contract is read as a whole, it is clear that at most plaintiff was assured that the defendant would permit the plaintiff to bring equipment (including cutting torches) to the work site in order to simplify the process of loading the material, but any risks or dangers which resulted were for plaintiff to ascertain, and plaintiff was responsible for protecting itself from loss. The defendant simply did not guarantee the safety of using cutting torches.

The Government does not normally guarantee the success of a contractor's operation. There is nothing in the present contract to convince the court that the defendant guaranteed that the plaintiff could successfully and safely use cutting torches in performance of this contract.

The foregoing discussion, rejecting plaintiff's claim that the defendant represented that cutting torches could be safely used, is reinforced by the presence of a dangerous property clause.

### ARTICLE AF: DANGEROUS PROPERTY

Purchaser is cautioned that articles or substances of an inflammable, toxic, or explosive nature may remain in the property notwithstanding the care exercised to remove same. The Government assumes no liability for damages to the property of the Purchaser or for personal injuries, disabilities or death to the Purchaser or the Purchaser's employees or to any other person arising from or incident to the purchase of this material or its use or disposition. The purchaser shall hold the Government harmless from any and all such demands, suits, actions, or claims

of whatsoever nature arising from or out of the purchase of this material.

Having been warned that substances of an explosive nature may remain in the scrap metal, it should not have been necessary for the defendant to warn the plaintiff not to use cutting torches on the scrap metal which might still contain explosives. The dangers were obvious, and defendant was not required to be more specific than the explicit contract provisions found in this case.

### Demilitarized

■ Plaintiff's second warranty claim is based on the description of the scrap metal as including "demilitarized 10 lb, 25 lb, 500 lb, 750 lb and 2000 lb practice bombs." The contract contained a guaranteed descriptions clause, article BB, which "guarantee[d] to the original Purchaser of the property that the property delivered * * * will be as described in the Invitation for Bids." Plaintiff claims that the defendant guaranteed that the practice bombs were demilitarized and that the defendant breached that warranty. Defendant argues that the adjective "demilitarized" was not part of the description which was guaranteed under the guaranteed descriptions clause. Defendant also argues that the limitation on damages contained in that clause bars recovery. Although we do not rely on defendant's arguments, we discuss these issues in order to shed some light on the interaction of the various clauses. Since we decide this claim in favor of defendant based on an interpretation of the contract as a whole, an understanding of the interaction of all of these clauses is relevant. Our analysis of this claim is similar to the discussion of plaintiff's claim that there was a warranty that cutting torches could be safely used.

Since we have already found that the Government did not assure the plaintiff that cutting torches could be safely used on the practice bombs, it is clear that the plaintiff's use of cutting torches on the practice bombs may have created dangers for which the defendant would not be liable even if defendant warranted that the bombs were demilitarized. Even if the defendant warranted that the bombs were safe for the normal handling required to remove them, defendant might be relieved from liability when plaintiff used cutting torches on the practice bombs which were potentially explosive as plaintiff was warned in the dangerous property clause. However, even if we were to decide this claim independently without incorporating or directly relying upon our prior conclusion that the defendant did not assume any liability for the use of cutting torches, the plaintiff still would not prevail.

The guaranteed descriptions clause contains the following exclusion, article BB, b(2):

> * * * THE GOVERNMENT DOES NOT WARRANT OR GUARANTEE * * *
>
> *    *    *    *    *    *
>
> (b) The stated condition of the property, * * * and the property's fitness for any use or purpose.

Section "a" of article BB provides that if there is a misdescription "the sole and exclusive remedy available to the Purchaser will be a refund of the purchase price of the property," and the clause concludes with the following section:

> d. *The foregoing guarantee is in lieu of all other guarantees, express or implied,* and all other obligations on the part of the Government to deliver or offer for delivery property as described in the Invitation for Bids *and shall not entitle the Purchaser to any payment for loss or profits or any other money damages, special, direct, indirect, or consequential; nor shall any recovery of any kind against the Government under this provision be greater in amount than a refund of the purchase price of the specific material found to have been misdescribed.* [Emphasis added.]

Unless the guaranteed descriptions clause can be read as warranting that the practice bombs were demilitarized, the plaintiff has no claim. Even if the clause does make the warranty, it expressly precludes the damages which plaintiff seeks and limits recov-

ery to refund of the purchase price which plaintiff has already received.

Neither of the exclusions expressed in the guaranteed descriptions clause seems applicable in this case. Defendant argues that the adjective "demilitarized" refers to the stated condition of the practice bombs. Therefore, defendant takes the position that since the stated condition is specifically exempted from the guaranteed descriptions clause, there was no warranty. However, we agree with the plaintiff who argues that the exclusion does not apply in this case. The stated condition exemption is generally interpreted as referring to instances where the property is described as workable, used, new, or in similar terms referring to "condition." *Benjamin v. United States*, 172 Ct.Cl. 118, 348 F.2d 502 (1965); *Beer v. United States*, 120 Ct.Cl. 690, 100 F.Supp. 808 (1951). Obviously the stated condition exemption cannot be extended to encompass every adjective that describes the surplus property. Such an extension of the exemption would make the guaranteed descriptions clause meaningless and a nullity.

The exemption that provides that the Government does not warrant the surplus property's fitness for a particular purpose also does not apply in this case. The warranty of fitness for a particular purpose applies where the seller has reason to know of the purpose for which the purchaser wants the goods and the seller knows that the purchaser is relying on the seller's skill and judgment to select the goods. Uniform Commercial Code § 2–315. The warranty results when under the facts the law implies that the seller has assured the purchaser that the goods are suitable. In this case, the purpose which plaintiff had in buying the material was to use it as scrap metal, presumably by recycling it. Defendant sold the material as scrap metal, and there is no claim that the material was not suitable for use as scrap metal. Therefore, the plaintiff's claim does not fall within this exemption.

Defendant also argues that the limitation on damages portion of the guaranteed descriptions clause bars recovery here. In *Freedman v. United States*, 162 Ct.Cl. 390, 320 F.2d 359 (1963), this court held that a general limitation on government's liability clause, similar to the general limitation clause in this contract, did not apply where the Government unilaterally cancelled a surplus sale contract. In that case the court said:

* * * Moreover, we have held that general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches, especially willful defaults, causing important loss to the contractor. * * * [Citation omitted.] [162 Ct.Cl. at 403, 320 F.2d at 366.]

*Freedman* construed the general limitation clause as applying to those situations where:

* * * (1) a need for the property develops after it has been declared surplus and offered for sale, or (2) a serious mistake has been made, such as a grave price discrepancy between the true value of the item and the amount bid. [162 Ct.Cl. at 396, 320 F.2d at 362.]

This latter portion of the *Freedman* opinion was relied upon in *Benjamin v. United States*, 172 Ct.Cl. 118, 138, 348 F.2d 502, 516 (1965), which held that a limitation clause was inapplicable to a claim that surplus generators did not conform to the warranted condition. In *Benjamin*, the clause relied upon stated:

"(2) Seller makes no warranty, either express or implied, with respect to the property, except (a) Seller warrants it has the right to transfer title to the property; and (b) Seller warrants the accuracy of the description of the property, provided however, that if the property is described as new, Seller warrants only that it has not been used. Seller's liability under this paragraph shall not exceed amount of purchase price." [*Quoted in* 172 Ct.Cl. at 166.]

Since the contract did not contain an explicit disclaimer of the description relied upon, the court in *Benjamin* did not allow the limitation to bar plaintiff's normal contract

damages. Although the *Benjamin* case seems to have extended the *Freedman* holding to a situation like the one present in this case, where the limitation is contained in the warranty clause upon which plaintiff relies, the dangerous property clause could be read as an explicit disclaimer which would distinguish this case from *Benjamin*. However, we need not resolve this issue since this case can be decided on other grounds.

Defendant relies heavily on the "as is, where is" disclaimer contained in the condition and location of property clause to rebut plaintiff's claim regarding a warranty that the practice bombs were demilitarized. However, that clause expressly provides that it does not apply where the Government has "otherwise specifically provided" a warranty with regard to the description, which is precisely the situation in the present case. Therefore, the "as is, where is" disclaimer does not support the defendant's argument. *See Benjamin v. United States*, 172 Ct.Cl. 118, 142, 348 F.2d 502, 519 (1965). *Harry Thuresson, Inc. v. United States*, 197 Ct.Cl. 88, 93, 453 F.2d 1278, 1280–81 (1972).

The contract also incorporated by reference a liability and insurance clause, article AB, which provides:

> The Purchaser, during the performance of this contract, shall be responsible for and *shall hold the Government harmless from* any and *all loss of*, damage to and liability with respect to *property* of every kind and description * * * whether or not owned by the Government, *or bodily injury to or death caused* either in whole or *in part by the negligence or fault of the Purchaser*, his officers, agents or employees in the performance of work under this contract. [Emphasis added.]

This clause is clearly inconsistent with the plaintiff's theory that the defendant guaranteed the safety of the plaintiff's operation and that defendant must hold the plaintiff harmless from any loss.

It is our conclusion that the same general reasons that resulted in rejection of the cutting torch claim mandate rejection of this claim. When the contract provisions are read together, it is clear that defendant did not assure plaintiff that the material was not dangerous. Contrary to plaintiff's claim that the defendant warranted that the material was safe by describing it as demilitarized, the defendant expressly put the plaintiff on notice of the hazardous nature, and possible dangers of the practice bombs, by expressly cautioning plaintiff in the dangerous property clause, and expressly stating that plaintiff was responsible for protecting itself and would have to bear any losses. Thus, if the use of the word "demilitarized" in the description implies that the material was nonexplosive and the guaranteed descriptions clause could elevate that word to a warranty, and the limitation of damages expressed in the guaranteed descriptions clause is not applicable for some reason, then it is still not enough to overcome the express warning regarding the potential dangers of the material and plaintiff's obligation to protect itself under the dangerous property clause. The specific language of the dangerous property clause takes precedence over the more general language of the other clauses. *Bradley v. United States*, 213 Ct.Cl. 745 (1977); *Dravo Corp. v. United States*, 202 Ct.Cl. 500, 504, 480 F.2d 1331, 1333 (1973); *Morrison-Knudsen Co. v. United States*, 184 Ct.Cl. 661, 696, 397 F.2d 826, 848 (1968). Only the dangerous property clause dealt specifically with whether or not explosive materials might remain. Plaintiff was clearly warned of those potential dangers and even if we assume that the description indicated otherwise, the dangerous property clause indicated the dangers, warned the contractor, and shifted the risk to the contractor.

Moreover, the undisputed facts before the court do not establish that the bombs were not demilitarized. Plaintiff relies on a definition of demilitarized, which indicates that the term means that the material has undergone a process "designed to prevent the further use of this equipment and material for its originally intended military or lethal purpose." If we assume that the existence of the spotting charge in the bomb is "its

military purpose," the use of the term "demilitarized" signifies that the practice bomb has undergone a process to eliminate the explosive potential of the spotting charge. Although the contract does not specifically define or reference a definition of "demilitarized," this meaning is in accord with the standard dictionary definition and thus gives the word its ordinary meaning. *Thanet Corp. v. United States,* 219 Ct.Cl. ——, ——, 591 F.2d 629, 633 (1979); *Hol-Gar Mfg. Corp. v. United States, supra,* 169 Ct.Cl. at 390, 351 F.2d at 976. The plaintiff also relies on Technical Order 11A–1–60 to establish that the minimum requirement for demilitarization is certification by qualified personnel that the material is inert. However, the technical order was not referenced in the contract and even if it did govern the demilitarization operation, the technical order is only a recommendation of the method of inspection, and is only mandatory when chemical or biological explosives are involved.

The facts contained in plaintiff's brief in support of its motion establish that the Government engaged in a "blow and go" procedure to demilitarize the residue on Gila Bend Field. In addition, the pretrial submissions to the trial judge establish that while J&W Construction was clearing the range, personnel from the Explosive Ordnance Disposal Branch of the United States Air Force were present and handled all material which had not been previously inspected and marked with black paint. It is clear that the Government had taken steps to demilitarize the practice bombs. Thus, we find that the use of the word "demilitarized" did not necessarily misdescribe the practice bombs. In light of the other warnings contained in the contract, it would be erroneous for the purchaser to assume that the use of the word "demilitarized" in the description of item 3 was a warranty that the material was 100 percent free of explosive potential. Plaintiff has attempted to rely upon admissions filed in another action between these same two parties in the United States District Court for the District of Arizona to support its position regarding a warranty that the practice bombs were demilitarized. The Federal Rules of Civil Procedure (Rule 36(b)) which govern the admissions made in district court, like Court of Claims Rule 72(d)(4), provide that admissions are for purposes of the pending action only. Plaintiff's attempt to make the admissions made in district court binding in this action is utterly devoid of merit. Moreover, our review of these admissions shows that they do not support the plaintiff's argument in the manner plaintiff relies on them, and our review of these admissions fails to disclose any significant admissions of fact which are contrary to the position taken by defendant in this case.

Even if the plaintiff were correct that there was a warranty of safety under Note C relating to use of cutting torches or in the description of the practice bombs as demilitarized, these provisions would be in direct conflict with other contract warnings, principally the dangerous property clause. Faced with such a patent ambiguity in the contract, plaintiff would have an obligation to inquire regarding the proper interpretation of the provisions. *Bromley Contracting Co. v. United States,* Ct.Cl., 652 F.2d 70 (1981); *Monroe M. Tapper & Assoc. v. United States,* 221 Ct.Cl. ——, 602 F.2d 311 (1979); *Space Corp. v. United States,* 200 Ct.Cl. 1, 5–6, 470 F.2d 536, 538–39 (1972). Having failed to inquire, plaintiff cannot recover.

We did not dwell on the issue of ambiguity because we have found that the contract provisions can be reasonably read in a manner so that there is no conflict between the provisions. It is also implicit in the foregoing analysis that we find there was no misrepresentation in the contract, and we reject plaintiff's argument in that regard.

## CONCLUSION

We do not read Note C as specifically warranting that the use of cutting torches would not be dangerous. In light of the dangerous property clause's warning as to the hazardous nature of the material, it seems clear that the Government expressly

placed the risks and duty to take precautions on plaintiff. If there was any ambiguity, it was patent, and plaintiff's failure to inquire bars any recovery in this case.

Similarly, the use of the word "demilitarized" in describing the practice bombs did not warrant that all explosive material had been removed. Numerous warnings and liability provisions in the contract put plaintiff on notice of the hazardous nature of the contract material. It would be unreasonable to read the contract as assuring the plaintiff that there would be no danger in using cutting torches on the demilitarized practice bombs. Explicit provisions provided that the contrary was true.

Therefore, the plaintiff's motion for partial summary judgment on Count Two of the petition is denied, and the defendant's cross-motion for partial summary judgment as to Count Two is granted. Count Two is dismissed and the case is remanded to the trial division for further proceedings on the remaining counts of the petition.