The B.B. ANDERSEN CONSTRUCTION CO., INC., a Kansas Corporation

v.

The UNITED STATES.

No. 395–81C.

United States Claims Court.

Jan. 31, 1983.

Edwin P. Carpenter, Topeka, Kan., for plaintiff. Hiatt, Hiatt & Carpenter, Topeka, Kan., of counsel.

R. Anthony McCann, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## ON CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### OPINION

WIESE, Judge:

This case, brought here under the "direct access" provision of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. IV 1980), involves a number of issues among them the question of which party, Government or contractor, is contractually responsible for certain fuel costs. This last is the single question now before the court on the parties' cross-motions for partial summary judgment. The decision is for the contractor.

### FACTS

On April 9, 1979, plaintiff, a Kansas corporation ("the contractor"), was awarded a fixed-price contract in the amount of $3,733,070 for the construction of a gymnasium at Haskell Indian Junior College in Lawrence, Kansas. The work required, among other things, that the contractor furnish all labor, equipment, supplies and materials essential to the installation of the facility's various mechanical systems, including, a fuel oil system.

Among the contract documents was a listing of the "Materials" applicable to the fuel oil system; under this heading there appeared a paragraph "e", entitled "Oil Charge", which specified that the fuel oil system's "[s]torage tank * * * be filled to maximum capacity at the time of final acceptance." The work has been done; the controversy that remains is to whose account the cost of the filled storage tank is assignable.

Plaintiff's subcontractor bid the work on the premise that the fuel to be consumed during performance (*i.e.*, fuel for system testing and temporary heating) was chargeable to the contractor while fuel consumed thereafter (*i.e.*, upon the assumption of Government occupancy) was not. The contracting officer disagreed with this distinction. His office took the position that, in addition to fuel for testing and interim heating, it was also the contractor's responsibility to provide a filled storage tank at the conclusion of performance. What precipitated the dispute was the language of paragraph "e" which reads, in full, as follows:

*Oil Charge:* Storage tank shall be filled to maximum capacity at the time of final acceptance or on the date of Government occupancy should [that] occur prior to final acceptance. A delivery ticket showing the type and amount delivered and the date signed by a representative of the Contracting Officer or of the using agen-

cy shall be forwarded to the Contracting Officer. This shall be a prerequisite for final payment unless waived by the Contracting Officer. All fuel oil required for testing and temporary heat shall be furnished by the Contractor.

The quoted language makes evident the reason for disagreement: it is accommodative to both points of view. Taking the Government's side of it first, the argument is that the paragraph would make no sense if the delivery of the fuel (the filling of the tank) was read as an obligation of the Government and not the contractor. We take it that what the Government means by this is [1] that the delivery obligation and the related cost obligation are one and the same in the sense that the filling of the fuel tank was a requirement intended to be covered in the bid price.

Put that way, there is much merit to the Government's position for the contract did specify that a filled storage tank—or, to be literally correct, a "delivery ticket" verifying compliance with the requirement for a filled storage tank—was "a prerequisite for final payment". Certainly, from this language of promissory condition, one would be justified in concluding that the costs of the fuel to the Government were meant to be covered in the final payment being given by the Government in return. The conclusion would go along with the fixed-price character of the contractor's undertaking and it would mean, of course, that the contractor should have anticipated the fuel costs in his bid.

Moreover, even if the substantive implications suggested by the phrasing "prerequisite for final payment" did not come naturally to mind (as well they might not for those not versed in the law) the lack of any further identifying detail (as to who was to pay), coupled with the fact that paragraph "e" appeared in the listing of materials required for contract performance, would have been enough to have placed a duty of inquiry upon the contractor.

The problem that one encounters here, however, is that the contract language did not leave well enough alone. It went on to add this final sentence: "All fuel oil required for testing and temporary heat shall be furnished by the Contractor." Relating this language to the Government's position, the problem that comes to the fore is one of redundancy. To explain: accepting the Government's position that the promised performance was meant to include the contractor's furnishing of (and bearing the costs of) a fuel storage tank filled to maximum capacity, it would be a pointless addition to the contract's text to further specify that the fuel consumed during performance (for testing and heating) should also be furnished by the contractor. The obligation to deliver a full fuel tank at the end of performance necessarily implies the subordinate obligation to restore (thus, to furnish) whatever fuel might be drawn-down during performance.

The contractor, of course, did not come across this redundancy in his reading of the contract language. Nor does the court think that he should have. To the contrary, the entirety of the language as it stood was seen to make sense. Keeping in mind that paragraph "e" fell under the general heading of materials to be furnished by the contractor, a restatement of that same thought in paragraph "e"—that all fuel required for testing and temporary heat "shall be furnished by the Contractor"— would be needless unless, of course, repetition was considered necessary in order to distinguish opposing thought appearing elsewhere in that same paragraph. And that is precisely what the language of paragraph "e" does suggest: the obligation to furnish fuel for heating and testing, specifically called out as an obligation of the contractor, would naturally be read as standing in contradistinction to a seemingly at-large requirement for a "[s]torage tank [that] shall be filled to maximum capacity at the time of final acceptance * * *."

---

1. If taken at face value, the argument would miss the whole point of the dispute for the question here was not who was responsible for the *physical* delivery of the fuel (that the contractor never challenged), but to whose account the fuel was chargeable following delivery.

Furthermore, the absence of the word "also" (as a qualification to the final sentence in paragraph "e") would negate any notion that the contractor was obliged, price-wise, to do more than furnish the fuel for interim heating and equipment testing needs. The lack of such an additive connotation could only reinforce the distinction in contractual duties that the words of paragraph "e" invite.

■ Fairly read, then, the paragraph does support the straightforward interpretation that guided the subcontractor's bidding: fuel that was to be consumed during contract performance was the contractor's (*i.e.,* subcontractor) obligation to furnish; fuel that was to be consumed following the Government's assumption of occupancy was the contractor's obligation to arrange the delivery of. The first was an obligation to be subsumed in the contract price and the other an obligation (better said perhaps, an accommodation) chargeable to the Government.

To be sure, this position is not without its own particular difficulty. The position attributes to the Government the odd circumstance of inviting a liability beyond the fixed costs of contract performance. That, in itself, poses a problem no less bothersome (and maybe even more so) than the redundancy that attends the Government's view.

■ Yet these are not distractions of like gravity so far as the present contract issue is concerned. Our concern is with reasonableness of interpretation—whether the contract language, carefully read and given its ordinary, everyday meaning and usage—fairly supports the meaning claimed for it. That test does not involve the further requirement that there be no legal pitfalls hidden in the interpretation chosen. Contractors are expected to understand the words of a contract; not the legal principles which might give those words some added, though otherwise non-apparent, dimension. *Cf. Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551

(1971). For this reason, then, we do not see any fatal flaw in the interpretation which the contractor espouses.

■ What all of this comes down to is that we have two contract interpretations each of which is essentially reasonable despite its own special problem. The errors or omissions in contract draftsmanship of which this duality is evidence places upon a contractor a duty of inquiry when the competing contract interpretations are open for all to see. Not to seek clarification under such circumstances carries with it the distinct risk of being wrong in the interpretation chosen and having to bear the costs attendant to that choice. *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 546 F.2d 367 (1976).

■ But, where the contract language masks its true intent and at the same time admits to a different but reasonable interpretation, it is the Government, as the drafter of the contract language, that bears the burden of a contractor's "erroneous" interpretation. *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874 (1963). This last is the rule that fits here.

## CONCLUSION

For the reasons stated, the contractor's motion for partial summary judgment is to be granted and the Government's cross-motion for partial summary judgment is to be denied. Further, it is ordered that judgment in the amount of $16,640.40 be entered in the contractor's favor together with interest on that amount at the rate provided by law, from June 4, 1980,[2] to date of final payment.

---

**2.** Although the petition seeks interest from May 23, 1980, the date the contracting officer received plaintiff's demand was June 4, 1980.

Under the relevant statute, 41 U.S.C. § 611 (Supp. IV 1980), the latter date is controlling.