**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 279–82C.**

United States Claims Court.

Oct. 6, 1983.

Christopher M. Klein, Washington, D.C., for plaintiff.

Randall B. Weill, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Richard W. Krempasky and Paula J. Barton, Federal Railroad Administration, Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This contract case comes before the court after argument on the parties' cross-motions for summary judgment. The facts are not in dispute.

## FACTS

On February 5, 1976, amid mounting concern over the threatened deterioration of rail service in the busy "Northeast Corridor" between Boston, Massachusetts, and Washington, D.C., Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 801–854 (1976 & Supp. V 1981) (the "Act"). The Act transferred the properties of bankrupt railroad companies in the Northeast Corridor to plaintiff National Railroad Passenger Corporation ("Amtrak" or "plaintiff"), a private, for-profit organization directed to be

formed by the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 501–645 (1976 & Supp. V 1981). At the same time, the Act provided for the physical rehabilitation of the Northeast Corridor rail system by a Northeast Corridor Improvement Project (the "NECIP"), intended to improve the rail bed and station facilities in order to launch a rail service operating at 120 mph in the Corridor. The Secretary of Transportation delegated his responsibility for the implementation of this plan to the Federal Railroad Administration (the "FRA").

Amtrak refused to grant the FRA a construction easement to build the improvements ordered by Congress on its property unless the FRA awarded it a major portion of the construction contract. Amtrak argued that it should do most of the work around the tracks because, as operator of the railroad, it could best coordinate the rail service and construction work so as to maximize the safety of both. Continuation of rail service during construction was necessary, because the Northeast Corridor main line is one of the busiest stretches of railroad in the world. The parties' intentions, undertakings, and expectations were embodied in a 175-page contract (the "Contract"). Section 2.01, stating the purpose of the Contract, accommodated the safety concerns by conferring a "dual role" on Amtrak as construction manager for part of the project and as "systems operator responsible for . . . coordination of construction with rail operations." Subsection 2.01(e) explicitly conferred on Amtrak the responsibility of ensuring "safe operations."

Because Congress' annual appropriations to Amtrak were made for the sole purpose of operating a rail passenger service, Amtrak also insisted on being indemnified for any and all claims having any connection with the NECIP work. The parties eventually agreed in section 8.40 that the FRA would reimburse Amtrak for that portion of the insurance premiums paid under its existing policies which were "allocable to this Contract." Amtrak's existing catastrophic insurance had a limit of $38 million in excess of a deductible of $2 million. Amtrak also was insured for up to $10 million in

excess of a $1-million deductible for damage to rolling stock and for up to $10,900,-000 in excess of a $100,000 deductible for damage to fixed properties. The FRA also agreed to indemnify Amtrak for certain losses within the deductible amounts, which the Contract called "the costs of self-insurance," and for certain losses in excess of the policy limits. The issue of the kind of risks to be covered by indemnification was debated vigorously and precipitated this lawsuit.

On April 20, 1979, an Amtrak train collided with a piece of NECIP equipment as the result of an error by an Amtrak switch operator. Defendant reimbursed Amtrak in the amount of $29,000 for settling the claims of employees who were on the NECIP equipment. On December 28, 1981, the contracting officer denied Amtrak's request under section 8.40 for indemnification of the third-party claims and for the damage to Amtrak's property. The final decision recited that reimbursement for "self-insurance" under subsections (c)(ii) and (iii) was subject to "conditions . . . detailed in subsection 8.40(c)(iv)"—that the costs have arisen out of and during performance of the Contract, in addition to being allocable to the Contract. According to the contracting officer, Amtrak's claims did not meet these conditions. Defendant thus denied Amtrak's claims for $54,923, representing damage to the train, and for $259,449.45 paid to passengers and Amtrak employees aboard the train in settlement of personal injury claims. Amtrak subsequently paid additional claims of $95,000 to passengers and Amtrak employees.

## DISCUSSION

"A contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." *Victory Carriers, Inc. v. United States,* 199 Ct.Cl. 410, 421, 467 F.2d 1334, 1342 (1972); *accord, A & K Plumbing & Mechanical, Inc. v. United States,* 1 Cl.Ct. 716, 721 (1983) (SETO, J.) (citing cases); *see Kolar, Inc. v. United States,* 227 Ct.Cl. 445, 449, 650 F.2d 256, 260 (1981). "Our concern is with rea-

sonableness of interpretation—whether the contract language, carefully read and given its ordinary, everyday meaning and usage—fairly supports the meaning claimed for it." *B.B. Andersen Construction Co., v. United States,* 1 Cl.Ct. 169, 172 (1983) (WIESE, J.).

Subsection 8.40(c) of the Contract provides in pertinent part:

Amtrak shall be reimbursed by the Government for the portion *allocable to this Contract* of:

(i) the cost of insurance as required or approved pursuant to the provisions of this Section 8.40;

(ii) ... the cost of self-insurance pursuant to subsection (a)(iii) of this Section 8.40; the costs of self-insurance, as used in this subsection (c)(ii), shall mean the amounts of liabilities or claims by third persons (including employees of Amtrak) paid directly by Amtrak under the deductible provisions of ... [Amtrak's catastrophic insurance policy] ....

(iii) ... the costs of self-insurance pursuant to subsection (a)(iv) of this Section 8.40; the costs of self-insurance, as used in this subsection (c)(iii), shall mean the losses suffered by Amtrak within the deductible amounts provided in, or in excess of the limits of, or excluded from the coverage of ... [Amtrak's rolling stock and fixed properties insurance policies] ...;

(iv) the cost of claims or liabilities to third persons for loss of a [sic] damage to property (other than property (A) owned, occupied or used by Amtrak ...) or for death or bodily injury, not compensated by insurance or otherwise,

*arising out of and during the performance* of this Contract, whether or not caused by the negligence of Amtrak ....

(Emphasis added).

■ Amtrak argues that the Contract obligates the FRA to indemnify it for the rejected claims under subsections (c)(ii) and (iii) as costs "allocable to" the Contract. The Government contends that clause (iv) controls with its concededly more stringent standard of "arising out of and during the performance of" the Contract. According to the Government, this language extends indemnity for claims based on acts attributable to Amtrak's performance of the Contract, not Amtrak's performance of activities as a rail operator. The Government specifically contends that an indemnification claim must have originated from the NECIP construction work.

Under the terms of subsection 8.40(c), Amtrak is to be reimbursed for any liability or damage it incurs which is "allocable to" the Contract, except that indemnification under subsection (c)(iv) is subject to the additional requirement that the liability arise out of and during the performance of the Contract. The only kind of liability for which indemnification is so limited is liability to third persons which is in excess of Amtrak's insurance coverage.[1] The cost of damage to Amtrak's own property, completely covered by subsections (c)(i) and (iii), is excluded expressly from subsection (c)(iv). The cost of all claims of third persons below $40 million is covered by outside insurance, reimbursed under subsection (c)(i), or "self-insurance," reimbursed under subsection (c)(ii). Accordingly, the cost of such claims also is excluded expressly from

1. Work package AM–013, which allocates funds to pay costs under section 8.40, apparently creates a third standard for reimbursement of any increase in the insurance premiums paid by Amtrak under its existing insurance policies by undertaking only to pay those additional premiums which are "attributable to Amtrak's participation" in the Contract. Thus, three standards of connectedness between possible damage or liability and the Contract work appear to exist for determining which portion of such costs are reimbursable. For indemnification of costs within the deductibles, the Contract merely requires that such costs be "allocable to" the Contract. An "arising out of and during performance" standard applies to costs in excess of Amtrak's coverage. Initially, defendant was not required to pay anything for the costs attributable to increases in insurance premiums during performance of the Contract, but if such costs increased, defendant was obligated to pay that part of the increase which was attributable to Amtrak's participation in the Contract.

subsection (c)(iv) by the phrase "not compensated by insurance or otherwise."

Amtrak is seeking reimbursement for costs of self-insurance under subsections (c)(ii) and (iii), since Amtrak seeks indemnification for liability to third persons (including Amtrak employees) and for damage to its rolling stock amounting to less than $2 million and $100,000, respectively—within the deductible amounts of Amtrak's catastrophic and rolling stock insurance policies. To be reimbursable, these costs need only be "allocable to" the Contract. They need not have arisen out of and during the performance of the Contract, as that requirement applies only to claims for indemnification under subsection (c)(iv).[2] No such claim is involved here.

■ The question remains whether the costs sought to be reimbursed meet the test of being "allocable to this Contract." The word "allocable" itself is uninformative absent reference to some other indication of what insurance costs the parties intended to be allocable to the Contract.

Amtrak's affiant John J. Hannigan, the Amtrak representative responsible for negotiating the indemnity provisions, avers that one of the hypothetical accidents for which Amtrak demanded to be indemnified during the negotiations was a possible collision between a passenger train carrying hundreds of passengers and a piece of NECIP equipment. Hannigan Aff., ¶ 8. According to Hannigan, "The FRA representatives acknowledged the need for the indemnity provision to cover the hypothetical accidents which we had cited and discussed, and at no time did the FRA representatives insist that the indemnity provision be limited to accidents exclusively involving or affecting NECIP workers and equipment." *Id.* ¶ 10. This statement that Amtrak specifically demanded indemnification for a collision between a passenger train and a piece of NECIP equipment and that the FRA agreed that the hypothetical accidents described by Amtrak should be covered remains uncontroverted.

The parties agree that the contract language should be interpreted standing alone and that the affidavits need only be consulted for background facts. Hannigan's statement is corroborated, however, by section 2.01 of the Contract which makes the coordination of rail traffic and construction, so as to avoid collisions, an element of Amtrak's performance under the Contract. Under subsection 2.01(a) Amtrak was to be assigned "all Work Elements that involve continuity or safety of railroad operations." Such work elements were defined in subsection (a)(ii) as ones the performance of which would, *inter alia,* "subject trains to a material risk of derailment or collision as a result of performance of such work." Subsection 2.01(e) further charged Amtrak with responsibility as systems operator "to assure continuity of efficient, safe operations."

Plaintiff takes the position that the function of the switch operator whose error caused the accident fell into the category of work elements defined in subsection 2.01(a)(ii) and that the cost of the resulting claims and damage therefore was allocable to or arose out of the performance of this

---

**2.** Had subsection (c)(iv) governed, *Fox Valley Eng'g, Inc. v. United States,* 151 Ct.Cl. 228 (1960) (per curiam), not cited by the parties, provides guidance in construing the critical phrase. In *Fox Valley* the indemnity provision read:

> RISK—The Contractor shall assume all risks in connection with the execution of this contract and waive any claim against the Government for damages arising out of the performance of the work specified and shall agree to protect and save harmless the Government from any claims from damages which may result from injuries to property or persons in connection with this work.

*Id.* at 238. The court adopted the trial commissioner's construction: "The provision was clearly intended to provide immunity to the Government only as to claims by third parties for damages for injuries arising out of plaintiff's performance of the Contract." *Id.* at 239.

Assuming, *arguendo,* that Amtrak's claims arose under subsection (c)(iv), the result would not change. Subsections 2.01(a) and (e) of the Contract, discussed *infra* p. 520, assigned Amtrak as a performance responsibility all work elements involving safety of railroad operations.

work element of the Contract. Defendant counters that Amtrak had a pre-existing duty to ensure the safety of its passengers. Consequently, according to defendant, any agreement to indemnify Amtrak for such claims is void as lacking consideration. The short answer is that the Government, having imposed a contractual obligation on Amtrak to operate its trains safely in the context of the added risks imposed by the NECIP project, cannot be heard later to claim that this consideration was redundant of a pre-existing statutory obligation.

Moreover, Amtrak was under no obligation to grant the FRA an easement on its property to perform work which defendant considered necessary to serve the national interest, but the presence of which increased the risk of train accidents and resulting liability to plaintiff. The fact that such accidents might be caused by the negligence of plaintiff's own employees would not reduce this concern. The presence of the NECIP activity increased Amtrak's exposure to liability for train accidents, as well as the precautions needed to be taken by Amtrak to fulfill its pre-existing duty. For this reason Amtrak refused to grant an easement unless it was awarded the Contract, arguing that it could best coordinate construction and train operation to minimize accidents, while demanding indemnification for any accidents caused by the mere presence of NECIP which, nonetheless, might result.[3]

Finally, defendant argues that the Anti-Deficiency Act, 31 U.S.C.A. § 1341(a) (West Supp. 1983), precluded an open-ended indemnity in that such an indemnity would have obligated FRA in unlimited amounts potentially in excess of amounts appropriated. Complete indemnification of Amtrak for losses within the deductibles, however,

would not have had this effect. Moreover, section 9.01 of the Contract and Work Package AM–013 solved the problem by providing for a fixed appropriation and limiting reimbursements to Amtrak to the amount of the appropriation. The appropriation eventually made ($2.5 million) was adequate to cover the losses for which Amtrak claims reimbursement in the case at bar. There is no suggestion that the requested reimbursement to Amtrak would cause the amount of this appropriation to be exceeded.

## CONCLUSION

Plaintiff's motion for summary judgment is granted, and defendant's is denied. The parties shall file a stipulation as to the amount of judgment by October 28, 1983.

---

3. Defendant also argues that, in order to be "allocable", a cost must be "assignable or chargeable to one or more cost objectives ... in accordance with the relative benefits received or other equitable relationship," 41 C.F.R. § 1–15.201–4 (1983), whereas in the instant case "[no] benefit, equitable or otherwise, flow[ed] to the Contract from the metroliner's operation." Def's Br. at 34–35. Section 2.01

identifies Amtrak's coordination of rail traffic and construction as a benefit flowing to the Contract, while the increased risk of accidents imposed on Amtrak by the presence of the construction activity may be said to have given rise to an "equitable relationship" obligating defendant to indemnify Amtrak for collisions between trains and NECIP equipment.