**WALTER DAWGIE SKI CORPORATION, an Arizona Corporation,**

v.

**The UNITED STATES.**

No. 92–12C.

United States Court of Federal Claims.

Oct. 21, 1993.

**118**

Jerry Mathias Myers, Tucson, AZ, for plaintiff.

Steven J. Abelson, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Ellen R. Hornstein, of counsel.

## OPINION

YOCK, Judge.

This Government contract case comes before the Court on the defendant's motion for summary judgment. The plaintiff, Walter Dawgie Ski Corporation (Dawgie), in this action seeks damages from the United States Government for the alleged denial of road access to its ski facilities occupied by the plaintiff under permits issued by the United States Department of Agriculture, Forest Service. Citing language contained in its special use permit agreements with the Forest Service requiring yearlong operation of its ski facility, the plaintiff alleges an implied warranty of road access, a denial of such right, and a subsequent breach of contract. Further, citing parol evidence to the permit agreements between itself and the Forest Service, the plaintiff infers the existence of certain express warranties of road access as well as breach of the implied duty not to hinder performance. In the instant motion for summary judgment, the defendant contends that the United States owes no duty of access to the plaintiff and, alternatively, that any denial of access caused by the road construction at issue here and ordered by the United States Department of Transportation, Federal Highway Administration (FHwA) constituted a sovereign act.

For the reasons cited by the defendant, as outlined below, this Court grants the defendant's motion for summary judgment.

### Facts

■ In a "term special use permit,"[1] dated June 1, 1978, the plaintiff (Dawgie) entered into a contractual agreement with the Forest Service. Under the terms of the permit, the Forest Service granted permission to the plaintiff to use thirty acres atop Mount Lemmon in the Coronado National Forest, almost entirely within Pima County near Tuscon, Arizona, for winter sports and other recreational purposes for a period of twenty years. The permit encompassed the use of Government-owned improvements at the site, including a ski lodge, a chair lift, a surface tow, and rental and repair facilities for winter sports equipment. The permit also provided for a restaurant and bar facility for yearlong operation. In a "special use permit,"[2] dated June 1, 1978, the plaintiff entered into a similar contractual agreement with the Forest Service. Under the terms of this separate agreement, the Forest Service granted permission to Dawgie to use approximately 120 acres of specified ski trails on Mount Lemmon. Pursuant to the terms of these two permits, the plaintiff operates the ski area, ski resort, and restaurant and bar, known collectively as the Mount Lemmon Ski Valley, year around.

The only paved route of access to the Mount Lemmon Ski Valley, as well as several

---

1. A term special use permit is not a real estate lease, but is merely an authorization to use certain land for a period of years upon the payment of a fee. *But see Oregon Summer Home Owners Ass'n v. Johnson*, 265 Or. 544, 550, 510 P.2d 344, 346 (1973) (paralleling a term special use permit to a lease for tax purposes). As this type of permit may be revoked at any time and for any reason, the term special use permit creates a tenancy at will. *See generally* 36 C.F.R. § 251.51 (1992).

2. A special use permit is also not a real estate lease, but is merely an authorization to use certain land upon the payment of a fee. *Ness Invest. Corp. v. United States*, 219 Ct.Cl. 440, 443, 595 F.2d 585, 586 (1979); *Mountain States Tel. & Tel. Co. v. United States*, 204 Ct.Cl. 521, 529, 499 F.2d 611, 616 (1974). Further, as with the term special use permit, this type of permit likewise creates a tenancy at will and may be revoked at any time and for any reason.

hundred residential homes, sundry civic and religious recreational locations, and various governmental installations and facilities, comprises the General Hitchcock Highway (also known as Arizona Forest Highway 39 (FH 39), Catalina Highway, and Mount Lemmon Road). The General Hitchcock Highway begins about three miles northeast of Tucson, Arizona, traverses the Coronado National Forest, and extends northerly to the Mount Lemmon Ski Valley atop Mount Lemmon. The following representation demonstrates the location of the highway:

American Automobile Association, Map of Arizona and New Mexico (1986) (reproduced in part).

The Bureau of Public Roads (now the Federal Highway Administration) and Bureau of Prisons, in cooperation with the Forest Service and Pima County, Arizona, initially constructed the General Hitchcock Highway in 1951. Pima County currently maintains the highway and accomplishes winter snow removal under contract with the Forest Service. Various problems with the highway, predominant of which includes the status of the highway as that with the highest accident rate in Pima County, led to plans for the reconstruction and improvement of the highway. Accordingly, the Forest Highway Program agencies, including the Forest Service, the Arizona Department of Transportation, and the Federal Highway Administration as lead agency, authorized funds for the development of a road reconstruction and improvement strategy (as well as traffic interference and closure schedules) for the General Hitchcock Highway.

Pursuant to this strategy, on July 27–29, 1983, the FHwA conducted an inspection of the highway and, following a public meeting on July 28, 1983, prepared a report containing certain findings and recommendations. See Mark Taylor and Robert Arensdorf, United States Department of Transportation, Inspection Report, Arizona FH 39, General Hitchcock Road (1983) (hereinafter Inspection Report). The Inspection Report focused on the anticipated engineering components of the reconstruction and improvement project in addition to design and other aesthetic modifications to the General Hitchcock Highway. The scope of work encompassed "moderate widening, modification of some sharp curves, providing positive surface

drainage and area for the deposit of snow, strengthening and overlay of the existing pavement materials, additional pull-offs/off-road parking, lateral sight distance and other safety related improvements." *Id.* at 1. As for traffic interference, the report stated:

> Traffic control will be a major consideration in the project development. We anticipate the road will be kept open during construction as no acceptable detour is available. Intermittent road closures will be required during work hours for rock excavation and blasting, and retaining wall construction.
>
> Alternate one-way traffic control with flag persons, pilot cars, and temporary traffic signals may be required much of the time.

*Id.* at 2. The Inspection Report concluded that, irrespective of funding for the actual construction, further engineering and environmental studies would take at least three years for completion.

On June 18, 1985, the FHwA issued one of the first environmental studies. *See* ENVIRONMENTAL ASSESSMENT FOR RECONSTRUCTION OF ARIZONA FOREST HIGHWAY 39 GENERAL HITCHCOCK HIGHWAY, U.S. DEPARTMENT OF TRANSPORTATION (1985) (hereinafter Environmental Assessment). The Environmental Assessment established the environmental consequences of the proposed reconstruction and improvement project. Moreover, the assessment also described the anticipated traffic problems: "Although maintaining traffic during construction will be difficult, the highway will be kept open during construction since no acceptable detour is available. However, there will be intermittent closures which are addressed in the 'Construction Impacts' section." *Id.* at 2. In the "Construction Impacts" section, the Environmental Assessment continued:

> Due to the extensive rock excavation required to reconstruct and widen FH 39, frequent but scheduled traffic delays are anticipated during construction. Such delays will be necessary to allow the contractor to safely load and detonate blasting charges in rock cuts and remove the resulting rubble piles from the roadway. Typical traffic delays during construction

through rock areas will be about 2 hours. However, in certain areas and for certain operations, delays up to 4 hours are anticipated. *Complete daytime (8 am–4 pm) or other combinations of road closure are also possible* in order to expedite rock excavation and reduce the total number of days during which such blasting/excavation and traffic delays occur. Construction operations may occur at night. No construction will occur on weekends or holidays.

> \* \* \* \* \* \*

> Inconvenience to the public will be unavoidable \* \* \*.

*Id.* at 22 (emphasis added). The Environmental Assessment, moreover, contained specific consideration of anticipated traffic problems relating to the holders of special use permits issued by the Forest Service. In the "Special–Use Permittees" section, the Environmental Assessment recognized:

> The Forest Service permits a variety of private uses/developments on the District. These include: over 200 summer recreational residences, seven civic/church organization camps near the Palisade Work/Administration Station, sheriff's deputy and Game and Fish Department officer residencies near Palisade, about 80 electronic installations (radio, radar, microwave, etc.) near the mountain crest, two astrophysical sites (telescopes), an Air Force SAC facility, *and Mt. Lemmon Ski Valley—a ski area with related commercial facilities including ski shop, restaurant, and lounge.* Of these special-use permittees, only two summer recreational homes are close enough to the existing road to be adversely impacted by reconstruction of FH 39. The Forest Service has previously determined that the permits for these two cabins would be terminated prior to project construction.

> Reconstruction of FH 39 will cause traffic delays and inconvenience to the above permittees and other users of FH 39, but with proper scheduling and notification, *such delays should not be too disruptive or impose any significant economic impact on businesses on the mountain* (see the "Construction Impacts" section).

*Id.* at 21 (emphasis added). Thus, although the Environmental Assessment anticipated complete daytime road closures, the assessment nevertheless estimated no "significant economic impact on businesses on the mountain."

Consequently, on March 14, 1986, FHwA also issued a "Finding of No Significant Impact" (FONSI) based on the findings of the Environmental Assessment. *See* FINDING OF NO SIGNIFICANT IMPACT FOR RECONSTRUCTION OF ARIZONA FOREST HIGHWAY 39 GENERAL HITCHCOCK HIGHWAY, U.S. DEPARTMENT OF TRANSPORTATION (1986) (hereinafter FONSI of FH 39). Recapitulating and adopting the findings of the Environmental Assessment, the FONSI stated: "The improvement of FH 39 entails * * * [c]onstruction of the first section from milepost 0 to 3 [and] is scheduled to begin in October 1986 with additional sections currently programmed every other year until the 25–mile route is completed in approximately 10 to 15 years." *Id.* at 1. The FONSI concluded: "The Federal Highway Administration, Central Direct Federal Division, has determined that this project * * * will have no significant impact on the human or natural environment." *Id.* at 2. Thus, as in the Environmental Assessment, the FONSI reaffirmed the expectation of no "significant impact" by the proposed road operations.

Subsequent to the findings of the Environmental Assessment and the issuance of the FONSI, the Forest Highway Program agencies made certain adjustments to the road closure schedule for the reconstruction and improvement project on the General Hitchcock Highway. Specifically, on August 20, 1987, the Forest Highway Program agencies introduced a revised schedule which included entire daytime road closures (from 8:30 a.m. to 4:30 p.m.) on Tuesdays and Wednesdays for "periods of heavy excavation and construction of retaining walls." Letter from Ms. Iris O. Dewhirst, Supervisor, District 1, Pima County Board of Supervisors, to Mr. George Davies, President, Mt. Lemmon Ski Valley, at 3 (Sept. 14, 1987). On Mondays, Thursdays, and Fridays, however, the revised schedule established a "closure period * * * limited to 1:30 p.m. to 4:30 p.m.," or a maximum of three hours. *Id.* In response

to this change in the anticipated daytime road closure schedule, the president of the plaintiff corporation, Mr. George P. Davies, initiated the first of a series of letters and telephone calls to various individuals in the Forest Highway Program agencies, specifying the risk of the Tuesday and Wednesday daytime road closures on the business viability of Mount Lemmon Ski Valley. *See* Letter from Mr. George Davies, President, Walter Dawgie Ski Corporation, to Ms. Diane Madden, Pima County Department of Transportation (Sept. 23, 1987) ("I respectfully ask that this schedule be re-thought as it pertains to Tuesday and Wednesday closure times as it would be ruinous to our business * * *.").

Despite the plaintiff's protestations, in January of 1988, the FHwA contracted with Mountain Gravel & Construction Company (Mountain Gravel) for the reconstruction and improvement of the initial phase of the General Hitchcock Highway. However, prior to the initiation of work, on September 23, 1986, the Forest Service transmitted a copy of the contract provisions relating to road closures to the plaintiff. *See* Letter from Ms. Sarah Davis, Landscape Architect, Forest Service, to Mr. Jim Pitcher, Mt. Lemmon Ski Valley (Sept. 23, 1986). Under subsection five for "Maintenance for Traffic" of section 104 for the "Scope of Work," the contract contained the following provisions:

> For purposes of maintaining traffic and minimizing vehicle delays, construction operations shall be performed part width at a time such that traffic is maintained at all times under continuous two-way operation, except as provided below.
>
> 1. Road closures or traffic delays of any kind shall not be permitted on weekends between 12 noon Friday and 11 p.m. Sunday, or on holidays throughout the year. Holidays shall include all national holidays and Rodeo Day, February 26, 1987.
>
> 2. Between 11 p.m. Sunday and 12 noon Friday, except holidays, traffic may be maintained under continuous alternate one-way operation. The total length of one-way operation shall not exceed 1,000

feet, leaving no less than 10 feet width of bituminous surfaced or well-graded aggregate surfacing available for public traffic under alternate one-way control. Continuous alternate one-way operation shall be provided with traffic delay in either direction not to exceed 15 minutes, except the Contractor may suspend continuous alternate one-way operation during periods of light traffic for up to 15 minutes per 1-hour period in order to position equipment or remove or replace materials.

3. In order to perform normal construction operations employing a full shift, the Contractor may close the road to public traffic, except emergency vehicles, between between [sic] 11 p.m. and 5 a.m., Monday through Thursday except holidays.

4. In order to perform blasting work, but not other construction operations, *the Contractor may close the road to public traffic, except emergency vehicles, from April 1 to December 15 for two 3–hour periods between 8:30 a.m. and 11:30 a.m., and between 1:30 p.m. and 4:30 p.m., with the road being open to the public for a minimum of 2 hours between the two closure periods.* From December 15 to April 1, the Contractor may close the road to public traffic, except emergency vehicles, for a single 3–hour period between 12 noon and 4:30 p.m. in order to perform blasting work.

Upon encountering unusual field conditions not anticipated in the construction plans and requiring greater than part-width operations to rectify, the Contractor shall consult the Engineer and together develop a temporary traffic control plan designed to minimize traffic delays and provide a reasonably smooth running surface for the traveling public.

Contract No. C–1675–803 § 104.05 (hereinafter Mountain Gravel Contract) (emphasis added). Thus, in contrast to the revised road closure schedule established on August 20, 1987, the Mountain Gravel Contract contemplated public use of the General Hitchcock Highway for a minimum of two hours under the daytime road closure schedule (between 8:30 a.m. and 11:30 a.m. and between the 1:30 p.m. and 4:30 p.m.).

Despite the daytime road closure schedules recited in the Environmental Assessment and the FONSI, the revised daytime road closure schedule of August 1987, and the daytime road closure schedule recited in the Mountain Gravel Contract, Mountain Gravel closed the General Hitchcock Highway from 8:30 a.m. to 4:30 p.m., Monday through Thursday, without provision of the minimum two hours for public use during the daytime closure period. Accordingly, approximately one and one-half months after Mountain Gravel initiated work, on April 11, 1988, Dawgie submitted a letter of protest to Mr. Steve R. Plevel, District Ranger for the Coronado National Forest of the Forest Service. Letter from Mr. George Davies, President, Walter Dawgie Ski Corporation, to Mr. Steve R. Plevel, District Ranger, Coronado National Forest, Forest Service (April 11, 1988). The letter maintained that Mountain Gravel had conducted excessive and improper road closures which had resulted in economic damage to the plaintiff corporation. Particularly, the plaintiff further stated that these closures resulted in a significant impact on the ability of Dawgie to conduct business during regular business hours, resulting in a loss of business ranging from $600 to $800 a day and a consequent reduction in the facility's workforce.

On April 20, 1988, Mr. Plevel responded to Dawgie. Mr. Plevel instructed Dawgie that the road closure schedule had been amended to allow the daytime closures. Letter from Mr. Steve R. Plevel, District Ranger, Coronado National Forest, Forest Service, to Mr. George Davies, President, Walter Dawgie Ski Corporation (April 20, 1988). Furthermore, because the plaintiff had participated in the development of the road closure schedule, Mr. Plevel expressed some surprise at the objections made by Dawgie over the new schedule. *Id.* at 1. Mr. Plevel exclaimed:

George, your representative, Jim Pitcher, sat in the task force meetings and strongly recommended his preference for full day closures in the middle of the week (Tuesday/Wednesday) if it would help shorten overall project time. He said that he

would prefer to close business two days a week and operate with fewer employees to lessen the impact. He also recommended the closure period come at the end of ski season and prior to the heavy summer season.

*Id.* As the foregoing quotation demonstrates, however, various representatives from Dawgie had participated in numerous meetings regarding the reconstruction and improvement of the highway. From the first meeting in July of 1983, to the various task force meetings regarding the road closure schedule, Dawgie remained apprised of and involved in the deliberative proceedings.

In any event, as the closures continued to inhibit business, on September 14, 1990, the plaintiff submitted a claim for damages to Mr. James R. Abbott, Forest Supervisor for the Coronado National Forest of the Forest Service. Letter from Mr. George P. Davies, President, Walter Dawgie Ski Corporation, to Mr. Jim Abbott, Forest Supervisor, Coronado National Forest (Sept. 14, 1990). The claim contended (1) that the special use permits constituted contracts, (2) that the Forest Service owed Dawgie a right of access to the subject property under the contracts, and (3) that the Forest Service had breached the duty to provide access. As such, as stated in the claim, the plaintiff sought damages for breach of contract. Dawgie contended that the term special use permit and the special use permit constituted contractual agreements with the Forest Service,[3] and that "[i]mplicit in the contract was a covenant that the Forest Service, United States Department of Agriculture would permit access to the recreational facilities operated by Walter Dawgie." *Id.* at 1. In short, the plaintiff alleged an implied warranty of access under the terms of the permits issued by the Forest Service. On January 9, 1991, however, Mr. Abbott responded and notified the plaintiff that no cognizable claim existed under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–13 (1988). Letter from Mr. James R. Abbott, Forest Supervisor, Corona-

do National Forest, Forest Service, to Mr. George Davies, President, Walter Dawgie Ski Corporation (Jan. 9, 1991).

Almost one year later, on January 8, 1992, the plaintiff filed a complaint in this Court. For similar reasons as set forth in the claim submitted to the Forest Service, the plaintiff's complaint alleged some $180,414 in damages. Yet, in the complaint, the plaintiff claimed not an implied warranty of access but a breach of the implied duty not to hinder performance. Thus, by unreasonably restricting access to Mount Lemmon Ski Valley, by arbitrarily ignoring public objections, and by arbitrarily favoring construction demands to traffic concerns, the plaintiff claims breach of the implied duty not to hinder performance pursuant to the road reconstruction and improvement conditions (and specifically, the daytime road closure schedule) for the General Hitchcock Highway. Plaintiff's Complaint, at 2.

On August 24, 1992, the defendant filed the instant motion for summary judgment. The defendant's motion relies on two alternative theories; first, the Government argues that the Forest Service never warranted unlimited and uninterrupted access to the site at issue, and second, it contends that the sovereign acts doctrine obviates any claim regarding the closure of the highway. Subsequently, in the Plaintiff's Opposition to Defendant's Motion for Summary Judgment, the plaintiff generally contends the presence of factual issues and also presents additional theories of recovery. Thus, the plaintiff not only alleges (1) that the United States had an obligation not to hinder the performance of Dawgie, and (2) resurrected the claim that the United States had implicitly warranted a right of access to the subject property, but also contends (3) that the United States had expressly warranted the times for closure of the road and breached such warranty. In addition, the plaintiff also refutes the defendant's position that the closure of the General Hitchcock Highway constituted a sover-

---

**3.** The defendant accedes to the status of the permits at issue as "contractual agreements" only for purposes of the summary judgment proceeding. Defendant's Motion for Summary Judgment, at 2 n. 2. This Court notes, neverthe-

less, the general acceptance of these permits as contracts. *See, e.g., Meadow Green–Wildcat Corp. v. Hathaway,* 936 F.2d 601, 602 (1st Cir.1991); *Sabin v. Butz,* 515 F.2d 1061, 1068 (10th Cir. 1975).

eign act. In the Defendant's Reply, the defendant rebuts the plaintiff's allegations of a factual dispute as well as the plaintiff's additional grounds for recovery, primarily seeking application of the sovereign acts doctrine.

As referenced above, and based on the absence of any source for the warranties of access or the implied duties claimed by the plaintiff, and also based on the discussion of the sovereign acts doctrine presented by the defendant, this Court agrees that the plaintiff presents no cognizable claim. Therefore, this Court grants the defendant's motion for summary judgment.

## Discussion

Summary judgment is appropriate only when a court determines that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. RCFC 56(c). Thus, summary judgment is appropriate here if the Government carries the burden of showing that (1) there is no genuine issue of material fact and (2) it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

When making a summary judgment determination, a court first determines the existence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). While the movant bears the initial burden of showing the absence of all genuine issues of material fact, the burden on the moving party may be discharged by showing either the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. *Meade v. United States,* 27 Fed.Cl. 367, 369 (1992). Once the movant discharges this burden, the burden falls on the nonmovant to demonstrate specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Such evidence must be viewed in a light most favorable to the nonmovant.

■ Nevertheless, to establish a genuine issue of fact, the nonmovant must do more than present "some evidence" as grounds that an issue is disputed. *Messerschmidt v. United States,* 29 Fed.Cl. 1, 14 (1993). Indeed, "[i]f the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). "The litigant opposing summary judgment, therefore, 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial. Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (citing *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). "Thus, a nonmovant must do more than merely raise some doubt as to the existence of a fact; evidence must be forthcoming from the nonmovant which would be sufficient to require submission to the jury of the dispute over the fact." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1560 (Fed.Cir. 1988).

■ In this case, the movant (the defendant) attests that the plaintiff has proffered no showing of a genuine factual dispute between the parties. In so doing, the defendant discharges the initial burden which then falls to the nonmovant. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Consequently, the nonmovant (the plaintiff) contends that the reasonableness of the actual daytime road closure schedule for the reconstruction and improvement of the General Hitchcock Highway constitutes a genuine issue of fact. In considering this summary judgment motion, therefore, this Court must ascertain whether this issue indeed comprises a genuine issue of fact. Of course, the prerequisites for summary judgment include not an absence of all factual disputes but an absence of genuine issues of *material* fact, and all issues of fact are not necessarily material. Indeed, the applicable substantive law determines the "material" facts, and thus, only disputes over facts that might affect the resolution of the case will properly preclude summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Pope v. United States,* 16 Cl.Ct. 637,

639–40 (1989); *Avedon Corp. v. United States,* 15 Cl.Ct. 771, 774 (1988).

■ As an initial matter, the plaintiff makes no claim of a factual dispute regarding the presence or absence of a right of access to the permit property or of the duty of good faith and fair dealing. Instead, the plaintiff claims a factual dispute solely over the scope of such access to the permit property (*i.e.,* the reasonableness of the road closure schedule). In contrast, the defendant avoids discussion over the scope of access to the permit property, asserting that no such right of access ever existed. The defendant argues that the plaintiff had neither an express nor implied right of access to the permit property and, therefore, that the plaintiff could not properly challenge the scope of any such fictional access. While the factual dispute proffered by the plaintiff references a difficult issue of fact, the dispute presented by the defendant, of whether a right of access indeed exists, constitutes a more ascertainable question. For, as the claims made by the plaintiff all depend on a right of access to the permit property, the absence of such a right would obliterate the plaintiff's case. Consequently, because the plaintiff fails to demonstrate any evidentiary source for the claimed right of access, as considered in more detail below, the plaintiff makes only conclusive allegations, and as recited above, mere colorable assertions fail to give rise to a genuine issue of material fact. Therefore, as this Court finds that no right of access exists, only legal and no factual questions remain. *See United States v. Sumitomo Shoji, New York, Inc.,* 63 C.C.P.A. 79, 83, 534 F.2d 320, 324 (1976) (finding only factual issues, and not legal issues, as genuine issues of material fact favoring defeat of summary judgment). Moreover, as alternatively pointed out by the defendant, because the actions of the Forest Highway Program agencies comprise sovereign acts, any remaining factual issues over the scope of access proffered by the plaintiff likewise become moot. Therefore, because the plaintiff presents no evidence of a right of access to the permit property, and as the road reconstruction and improvement by a federal agency on federal land constitute sovereign acts, as concluded below, this Court finds that no factual dispute exists in the present litigation. Accordingly, this Court renders summary judgment for the defendant.

When making a summary judgment determination, however, a court not only considers issues of fact but must also consider whether the movant is entitled to a judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. As noted in the factual recitation of this Opinion, the plaintiff presents three bases of recovery pursuant to the alleged lack of access accorded by the daytime road closure schedule on the General Hitchcock Highway, while the defendant proffers two legal grounds for summary judgment. Resultingly, this Court considers these arguments in turn.

The fundamental basis of recovery claimed by the plaintiff, and refuted by the defendant, implicates the right of access to the Mount Lemmon Ski Valley via the General Hitchcock Highway. As the plaintiff properly points out, in the context of Government contracts, the right of access to a work site encompasses express warranties, implied warranties, and implied duties. Nevertheless, as the plaintiff fails to realize, these "rights" of access arise (and subsequently are breached) under specific and nongeneral circumstances. The right of access by express warranty requires an explicit provision within the terms of the contract of a specific means of access. The right of access by an implied warranty describes a similar situation except that the surrounding circumstances of the contract, and not the express provisions thereof, represent or indicate a certain means of access. The right of access by implied duty implicates the range of duties owed a contractor by the Government under the duty of good faith and fair dealing. As with the express and implied warranties of access, however, these implied duties also require either an explicit or implicit provision of access within the terms of the contract. In the case at bar, the plaintiff seeks recovery under each rationale.

## A. *Express Warranty of Access*

To begin with, the plaintiff seeks damages for the alleged breach of express warranties

as contained in the proposed road closure schedules recited in the Inspection Report, the Environmental Assessment, the FONSI, and in the Mountain Gravel contract. The plaintiff points to the Inspection Report which anticipated only "intermittent" daytime road closures. Next, the plaintiff cites the Environmental Assessment which estimated two to four hour daytime road closures, even though the assessment also warned of complete daytime road closures. The plaintiff further cites the FONSI which adopted the findings of the Environmental Assessment. Finally, despite the road closure estimates disclosed in the revised schedule of August 1987 which anticipated entire daytime road closures, the plaintiff also cites the two hour daytime public use provision of the Mountain Gravel contract. Based on these documents, the plaintiff alleges four sources of an express guarantee, or warranty, that the daytime road closure schedule for the General Hitchcock Highway would not entail complete daytime road closures. Apparently, except for the closure schedules noted in these documents, the plaintiff claims an unlimited and uninterrupted right of access to the permit property via the General Hitchcock Highway.

■ The defendant counters that the statements contained in the Inspection Report, the Environmental Assessment, the FONSI, and the Mountain Gravel contract do not give rise to an express warranty with regard to the contract between the plaintiff and the Forest Service. Further, the defendant asserts that these documents constitute parol evidence and thus remain inapplicable to the contractual provisions of the permits at issue under the parol evidence rule.[4] This Court agrees that the referenced documents give rise to no express warranty of access.

■ "[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 699 (1964). An express warranty, more specifically, arises by "express contract language regarding future events * * * which entitles the contractor to rely upon the occurrence or nonoccurrence of the event in pricing the contract." JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 179 (2d ed. 1986) (hereinafter ADMINISTRATION OF GOVERNMENT CONTRACTS). Therefore, despite the parol evidence proffered by the plaintiff of warranty, an express warranty exists only by reference to sources within the terms of the contract or contracts at issue. *Cf. D & L Constr. Co. & Assocs. v. United States*, 185 Ct.Cl. 736, 753, 402 F.2d 990, 999 (1968) (considering warranty based on both the contract documents *and* representations made by the contracting officer). As such, this Court reviews the language of the permits at issue to ascertain the presence or absence of express warranty.

■ An express warranty does not require formal words of creation. *Everett Plywood*

---

4. Distinguishable from the parol evidence rule, parol evidence constitutes any form of extrinsic evidence, oral or written, used to prove that which remains absent from a contract. 4 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 646, at 1144–46 (3d ed. 1961). Thus, the defendant correctly points out that the Inspection Report, the Environmental Assessment, the FONSI, and the Mountain Gravel contract comprise parol evidence; however, the defendant incorrectly attempts to apply the parol evidence rule. *See generally Nicholson v. United States*, 29 Fed. Cl. 180, 193–97 (Ct.Fed.Cl.1993). While parol evidence antecedent or contemporaneous to the contract at issue is generally excluded under the parole evidence rule, parol evidence subsequent thereto falls outside the confines of the rule. *Baggett Transp. Co. v. United States*, 162 Ct.Cl. 570, 577, 319 F.2d 864, 868 (1963); *Erwin v. United States*, 19 Cl.Ct. 47, 55 (1989); *De Barros v. United States*, 5 Cl.Ct. 391, 395 (1984). Therefore, this Court may consider the merit of the subsequent parol evidence to determine whether the evidence constitutes a modification to the underlying contract. *California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 26 (1990), *aff'd*, 937 F.2d 624 (Fed.Cir.1991); *Montana Power Co. v. United States*, 8 Cl.Ct. 730, 735 (1985). *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972) ("The function of the parol evidence rule, a rule of substantive law misnamed a rule of evidence, is the prevention of the variance of integrated agreements, usually written, by inconsistent *contemporaneous or prior terms*, usually oral.") (emphasis added).

& Door Corp. v. United States, 190 Ct.Cl. 80, 88, 419 F.2d 425, 429 (1969). To demonstrate an express warranty and breach thereof, "the plaintiff must establish that (1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue." Kolar, Inc. v. United States, 227 Ct.Cl. 445, 448, 650 F.2d 256, 258 (1981). Here, however, the plaintiff cannot even demonstrate the first element of the Kolar test, or that the Forest Service assured an unlimited and uninterrupted right of access to the permit property.

 As the plaintiff here presents no evidence of an express warranty regarding a right of access to the subject property within the contract terms, the plaintiff fails the most basic burden. For, absent specific language in the contract at issue, no express warranty exists. Ekco Prods. Co. v. United States, 160 Ct.Cl. 75, 80, 312 F.2d 768, 771 (1963); Burgwyn v. United States, 34 Ct.Cl. 348, 360, 1800 WL 2154 (1899). Instead, the plaintiff points to documents prepared and issued well subsequent to the contractual agreements pertaining to the permit property. This factual defect destroys the plaintiff's legal claim of an express warranty because statements made after memorializing an agreement cannot give rise to an express warranty. See Solar Turbines, Inc. v. United States, 26 Cl.Ct. 1249, 1273 (1992) ("[A]n affirmation of fact can create a warrant only where the affirmation is 'part of the basis of the bargain' in that it was made in the course of negotiating the agreement or a modification to the agreement."); id. at 1273 n. 22 ("A statement made after agreement has been reached is not an express warranty even though neither the buyer nor the seller had yet performed the contract.") (quoting Uniform Commercial Code § 2–313:10 (1970)).

Thus, in the complete absence of evidence of an express warranty of access within the contract terms, this Court concludes that no express warranties existed as to the provision of an unlimited and uninterrupted right of road access to the permit property.

B. *Implied Warranty of Access*

The plaintiff next claims a breach of contract for the denial of an implied warranty of access. As the two permits at issue required that the plaintiff operate the Mount Lemmon Ski Valley 365 days a year, and as the General Hitchcock Highway constitutes the only paved highway means of access to the facility, the plaintiff contends that the permits give rise to an implied warranty of unlimited road access. As such, the plaintiff argues that the Forest Service denied a right of access and thereby breached the contracts with the plaintiff.

However, the defendant asserts that the Forest Service owed no duty to provide unlimited and uninterrupted access to the property governed by the permits issued to Dawgie. Pointing to the governing statutes and regulations for such permits as well as to the language of the permits at issue, the defendant claims that "there was no contractual duty upon defendant to provide access to the ski area and resort." Defendant's Motion for Summary Judgment, at 7. Citing to the "Miscellaneous" section of the permits, under the subsection for "Services Not Provided," the defendant even contends that the permits expressly disclaim any express or implied warranty of access: "This permit is for the occupancy of land for the purpose stated and does not provide for the furnishing for *road maintenance*, water, fire protection, *or any other such service by a Government agency*, utility, association, or individual." Term Special Use Permit, at 6–7 (emphasis added); Special Use Permit, at 25 (emphasis added). Without ruling on the issue of disclaimer, under the unique circumstances of this case, this Court agrees that the Forest Service maintained no contractual duty, whether express or implied, to provide unlimited and uninterrupted access to the permit property.

 As with express warranties of access, which require express language of warranty within the language of the contract, an implied warranty of access requires some representation or indication of the guarantee of access. Gerhardt F. Meyne Co. v. United States, 110 Ct.Cl. 527, 550, 76 F.Supp. 811, 815 (1948). Cf. J.W. Bateson Co., GSBCA No. 4687, 80–2 BCA ¶ 14,608, at 72,059 ("Al-

though the contract documents in the instant case do not specifically designate access roads, * * * [t]he contract documents in and of themselves indicated that D Street would remain open."); *Reliance Enters.*, ASBCA No. 20,808, 76–1 BCA ¶ 11,831, at 56,573 ("Our conclusion therefore is that under the terms of this contract the Government assumed the obligation to make a suitable access road to Building 87 available at all times."). As evidence of this requirement, the defendant cites *United States v. Howard P. Foley Co.*, 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946). In *Foley*, the Supreme Court considered a claim where a contractor sought recovery for the costs associated with a delay in the availability of a runway before the installation of runway lights. *Id.* at 66, 67 S.Ct. at 154. As no express warranty of site availability existed, the claimant alleged an implied warranty. The Court denied the claim, however, because the contract had not expressly addressed the issue of site access. *Id.* at 66–67, 67 S.Ct. at 154–55. For the same reasons, the defendant seeks a similar result here. *See also Ben C. Gerwick, Inc. v. United States*, 152 Ct.Cl. 69, 77, 285 F.2d 432, 436 (1961) (requiring an express indication of site availability as a prerequisite to warranty). While this Court recognizes the distinction between denial of the availability of a work site with the denial of the right to road access, *see generally* ADMINISTRATION OF GOVERNMENT CONTRACTS, at 180–85 (discussing and contrasting the warranties of availability of work site and of availability of access roads), the requirement of an indication of guarantee as a prerequisite to an implied warranty remains equally applicable to both types of warranties of future conditions. *Id.* at 179–80. As with the express warranty of access, however, the plaintiff likewise demonstrates no evidence (except as noted below) of an implied warranty of access.

■ As for the contract provision proffered by the plaintiff relating to the yearlong operation of the facility at issue, nonetheless, this Court looks to analogous case law for a resolution of whether this evidence constitutes a warranty by implication.

In such respect, the claim submitted by the plaintiff in the case at bar appears similar to that maintained by the plaintiff in *Lenry, Inc. v. United States*, 156 Ct.Cl. 46, 297 F.2d 550 (1962). In that case, the United States Court of Claims summarized the legal argument as follows:

It is their position that the contract documents and the drawing of the construction site attached thereto, taken as a whole, establish a warranty on the part of defendant that the streets they selected as access roads would continue to be available to them throughout their performance of the contract. That is to say, the Government *guaranteed* in all events the continued existence and availability of certain city streets intended by plaintiffs to be used as access roads. Thus, regardless of the particular reason for their unavailability, the mere fact that such streets were not so available throughout the life of this contract would be enough to establish liability on the part of defendant for the increased costs here in issue. The single issue for our determination is therefore whether or not such a warranty exists in this case.

*Id.* at 49, 297 F.2d at 551. To prove an implied warranty, the plaintiffs in *Lenry* pointed to various contract provisions and to the drawing of the site. To consider any express indications of warranty within the contract documents, the court referenced the contract: "Representations which are not expressly stated in the contract and for whch [sic] liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the contractor." *Id.* at 51, 297 F.2d at 552. In summary, the court emphasized the oddity of providing a warranty for unlimited and uninterrupted access to a work site. The court concluded: "Had defendant ever intended to make such a unique and all-encompassing guarantee, and had plaintiffs expected it, we believe they would have so specified in clear and unmistakable language. In the absence of such language, it would require a more substantial basis than that shown by plaintiffs to impose the type of burden contended for upon defendant." *Id.* at 53, 297 F.2d at 553. On similar grounds, in light of the absence of

any representation or indication of warranty, this Court finds the plaintiff's proposition of a right of access unfounded.

Similarly, in *Turnkey Enters., Inc. v. United States,* 220 Ct.Cl. 179, 597 F.2d 750 (1979), the Court of Claims considered a similar situation to the present case where a plaintiff contended that the Forest Service had impliedly warranted unlimited and uninterrupted access to water. As in *Lenry,* the court in *Turnkey* focused on the presence or absence of express or implied contract language referring to the access to water. After reviewing the plaintiff's evidentiary showing, the court found: "There were no express representations nor were there any positive indications in the contract documents that would induce reasonable bidders to believe that water would be available from the Mad River at all times during the late summer and early fall months for contract performance." *Id.* at 192, 597 F.2d at 757. Thus, finding no warranty, the court determined: "The construction and interpretation plaintiff seeks to place on various provisions of the contract to the effect that the Forest Service impliedly warranted the availability of water in the Mad River during the period of contract performance * * * is not within the 'zone of reasonableness.'" *Id.* at 191, 597 F.2d at 757. In conclusion, the court also emphasized: "Merely because the Mad River is in the area of the contract work site does not justify finding a warranty that water from said river would be available for plaintiff's use at all times during contract performance absent contract provisions establishing such a warranty." *Id.* at 192, 597 F.2d at 757. Thus, in the instant case, this Court finds the lack of provision of any similar warranty pertaining to the General Hitchcock Highway.

Therefore, as evidenced by *Lenry* and *Turnkey,* and similar in respect to an express warranty which requires specific contract language, an implied warranty also requires an explicit representation or indication of warranty. Yet, whereas the plaintiffs in *Lenry* and *Turnkey* at least pointed to contract provisions as the source of an implied warranty of access, the plaintiff in the instant proceeding makes no such showing. Moreover, although the plaintiff points to *Ger-*hardt F. Meyne Co. v. United States,* 110 Ct.Cl. 527, 76 F.Supp. 811 (1948), and *D & L Constr. Co. & Assocs. v. United States,* 185 Ct.Cl. 736, 402 F.2d 990 (1968), as examples of implied rights of access, the defendant correctly notes that the Government had explicitly agreed to provide access in both of those cases. *See Gerhardt F. Meyne,* 110 Ct.Cl. at 549, 76 F.Supp. at 815 ("Whether or not plaintiff is entitled to recover for road maintenance and construction also calls for a construction of the contract and is a question of law. The specifications clearly contemplated the use of Patten Road and other paved roads."); *D & L Constr.,* 185 Ct.Cl. at 753, 402 F.2d at 999 ("It is clear that defendant, both by the contract documents and by the assurance of the contracting officer, warranted that there would be 'suitable access' to the project during the construction period."). Here, the Forest Service made no such agreement.

In summary, the plaintiff points to, and this Court finds no other recitation of, any express or implied provision for an unlimited right right of access to the permit property. Accordingly, this Court concludes that the permits at issue make no guarantee of access to the permit property and therefore accords no warranty of access.

### C. *Duty Not to Hinder Performance*

The plaintiff also claims a breach of the implied duty not to hinder performance. Referring again to the permits' provision of a yearlong operation of Mount Lemmon Ski Valley, the plaintiff argues that the daytime road closure of the General Hitchcock Highway constituted an unreasonable hinderance in the performance of the obligations required by the permits at issue. The plaintiff asserts unreasonableness based on the findings of a civil engineer who studied the road closure schedule and the work required for the reconstruction and improvement of the highway. Based on these findings, the plaintiff states that the construction could have taken place during the night with concurrent nighttime road closures. Further, the plaintiff also relies on these findings as evidence that blasting and hauling of rock should have occurred during the nighttime hours. As

FHwA and Mountain Gravel chose to use daytime road closures in order to affect these aspects of the road construction, the plaintiff claims that the Forest Service breached the implied duty not to hinder performance.

The defendant responds, however, that the Government cannot breach an implied duty not to hinder performance where the Government has not accepted responsibility for the duty in question (either contractually or otherwise) in the first place. Here, the defendant reiterates that the Forest Service never guaranteed or warranted access to the permit property. As evidence of this status, the defendant notes that the highway, on occasion, had been closed for snow removal but that the plaintiff had never challenged this limited interruption of access. Thus, in contrast to the plaintiff's emphasis of the year-long operation of the facility atop Mount Lemmon, the defendant notes that the permits make no provision for the unlimited and uninterrupted access to the facility as claimed by the plaintiff. Moreover, despite the claims of rights of access, the defendant points out that the Forest Service never stated, expressly or by implication, that the accessway to the permit property would remain free of interruption throughout the term of the respective permits. Indeed, the plaintiff presents no evidence to the contrary. As such, the defendant rejects any provision of a duty of access.

Notwithstanding the absence of a warranty or other guarantee regarding access to the permit property, the plaintiff nevertheless proffers the existence of a breach of the implied duty not to hinder performance. While the plaintiff correctly recites the general existence of such a duty, the plaintiff presents no factual basis for the breach of such a duty in the instant case relating to the denial of access.

The Government maintains certain "implied duties" in every Government contract. *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 94–95, 69 F.Supp. 409, 411 (1947). Generally, the courts refer to these duties collectively as the duty of good faith and fair dealing. *International Fidelity Ins. Co. v. United States,* 25 Cl.Ct. 469, 480 (1992); *Spalding & Son, Inc. v. United States,* 24 Cl.Ct. 112, 141 (1991). Specifically, however, this singular duty implicates the disparate aspects of the duty to cooperate and the duty not to hinder performance. Ralph C. Nash, Jr., *The Duty of Good Faith and Fair Dealing: An Emerging Concept,* 3 NASH & CIBINIC REP. ¶ 78, at 165 (1989). Under the duty to cooperate, the Government may not fail to cooperate reasonably with the contractor in the performance of a contract. *Terry v. United States,* 204 Ct.Cl. 543, 554, 499 F.2d 695, 700 (1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *Summit Contractors, Inc. v. United States,* 23 Cl.Ct. 333, 336 (1991); *PBI Elec. Corp. v. United States,* 17 Cl.Ct. 128, 133 (1989). Breach of this duty generally implicates the reasonableness of the Government's acts or omissions. ADMINISTRATION OF GOVERNMENT CONTRACTS, at 222. Furthermore, the nature and scope of this duty depends upon the facts and circumstances of the case. *Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81, 86 (1964). Under the implied duty not to hinder performance, the Government may not actively interfere in the performance of a contract by the contractor. *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir. 1988); *Lewis–Nicholson, Inc. v. United States,* 213 Ct.Cl. 192, 205, 550 F.2d 26, 32 (1977); *C. Sanchez & Son, Inc. v. United States,* 24 Cl.Ct. 14, 24 (1991), *aff'd in part and vacated in part,* 6 F.3d 1539 (Fed.Cir. 1993). Breach of this duty generally requires wrongful conduct by the Government. ADMINISTRATION OF GOVERNMENT CONTRACTS, at 223–24. Yet, in the case at bar, whether a court (or a party) focuses on the reasonableness or fault of a Government action, and claims a breach of the duty of cooperation or of the duty not to hinder performance, a breach of the implied duty of good faith and fair dealing requires generally either breach of warranty or Government fault. *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 550 (1984). Here, the plaintiff demonstrates neither.

█ In the instant case, the plaintiff seemingly combines the two good faith duties, claiming breach of the duty not to hinder performance based on the unreasonableness of Government action. The plain-

tiff, however, provides no factual basis for this claim. Thus, despite the confusion of theories and standards, the plaintiff presents evidence neither of unreasonable conduct by the Forest Service, for breach of the duty to cooperate, nor of wrongful conduct by the Forest Service, for breach of the duty not to hinder performance. Furthermore, as for unreasonableness, the factual recitation of this Opinion amply demonstrates a good faith effort by the Forest Highway Program agencies to accommodate the plaintiff in arranging a road closure schedule. Even though the agencies eventually required daytime road closures in excess of that anticipated, in view of the necessary and unavoidable event of periodic road closure for road reconstruction and improvement, this Court finds no evidence of unreasonable conduct in the road closure schedule developed for the General Hitchcock Highway, particularly with regard to the Forest Service. As for wrongful conduct, the plaintiff likewise fails to proffer any evidence demonstrating such conduct. While the duty not to hinder performance assuredly incorporates certain assurances of access to the permit area, the Forest Service never assured Dawgie, expressly or impliedly, of unlimited and uninterrupted access to the permit property. As such, in view of the reasonableness of the Government action, no factual basis exists on which the plaintiff may prove Government fault.

■ Also, as the defendant suggests, the plaintiff presents no legal basis for breach of the duty of good faith and fair dealing. Here, the plaintiff seeks to hold the Forest Service liable for actions taken by the Forest Highway Program agencies generally and the FHwA specifically. Yet, the plaintiff fails to cite the legal basis for holding the Forest Service responsible contractually for the actions of these other Government entities. As the heretofore cited implied duties relate solely to the acts or omissions of the Government agency at issue (here, the Forest Service), breach occurs neither by fault of the Forest Service nor by other causes, except by warranty. *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 557 (Fed.Cir. 1982). *See* RALPH C. NASH, JR. & JOHN CIBINIC, JR., FEDERAL PROCUREMENT LAW 1040 n. 1 (3d ed. 1980) ("The Government can only be held responsible for events not caused by its fault if the contract contains express language allocating such risks to the Government. Such language is generally referred to as a 'warranty' or 'guarantee.'"). And, as demonstrated in the above analysis of express and implied rights of access, the contractual documents relevant to the instant case implicate no such express or implied warranties. Accordingly, in view of the foregoing factual and legal review, this Court finds no showing of breach of the duty of good faith and fair dealing.

### D. Sovereign Acts Doctrine

Although the Court in its above discussion has now disposed of the plaintiff's three theories for recovery, it is nevertheless appropriate to discuss the Government's reliance in defense on the sovereign acts doctrine. The defendant in its summary judgment motion has argued that, even had one of the three "rights of access" discussed above existed as proffered by the plaintiff, the sovereign acts doctrine nevertheless would insulate the Forest Service from any breach claim in this case.

■ The sovereign acts doctrine (or defense) comprises an inherent element of every Government contract, whether or not explicitly stated therein. *Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953, 958 (Fed.Cir.1993). Pursuant to the doctrine, the Government escapes contractual liability for public and general acts taken in a sovereign capacity for the public good. *Fern v. United States,* 15 Cl.Ct. 580, 586 (1988), *aff'd,* 908 F.2d 955 (Fed.Cir.1990); *Sunswick Corp. v. United States,* 109 Ct.Cl. 772, 797, 75 F.Supp. 221, 228 (1948), *cert. denied,* 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948); *Hedstrom Lumber Co. v. United States,* 7 Cl.Ct. 16, 27 (1984). Whether an act is taken in a sovereign capacity depends upon the nature of the action and the relationship of the parties. *Kentucky Natural Resources & Envtl. Protection Cabinet v. United States,* 27 Fed.Cl. 173, 179 (1992); *Juda v. United States,* 6 Cl.Ct. 441, 454 (1984). As the general rule, provided the Government action takes a public and gener-

al nature and avoids a principal and primary focus on the relationship with the injured party, the act constitutes a sovereign act for which no liability in a contract sense arises. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 768, 572 F.2d 786, 817 (1978); *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 196, 351 F.2d 956, 967 (1965).

The sovereign acts doctrine found genesis in three opinions of the United States Court of Claims, as later adopted by the United States Supreme Court. In *Deming v. United States*, 1 Ct.Cl. 190, 191, 1865 WL 2004 (1865), the Court of Claims voiced the general proposition that "[t]he United States as a contractor are not responsible for the United States as a lawgiver." Then, in *Jones v. United States*, 1 Ct.Cl. 383, 1865 WL 1976 (1865), the Court of Claims further defined the *Deming* holding. The court explained: "The government is not, like an individual, cognizant of its own transactions. Those transactions are numberless, dependent on unnumbered officers, and scattered not only through every portion of its wide territory, but through every quarter of the world." *Id.* at 388. Accordingly, the court concluded:

> The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants. * * * [W]e repeat, as a principle applicable to all cases, that the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign.

*Id.* at 384–85. Finally, in *Wilson v. United States*, 11 Ct.Cl. 513, 520–21, 1800 WL 851 (1875), the Court of Claims reaffirmed the holdings of *Deming* and *Jones*. Citing these three Court of Claims cases, and quoting *Jones*, the Supreme Court approved application of the doctrine in *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925). Subsequently, the courts have repeatedly applied the sovereign acts doctrine. *See, e.g., Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 768, 572 F.2d 786, 817 (1978); *Amino Bros. Co. v. United States*, 178 Ct.Cl. 515, 525, 372 F.2d 485, 491, *cert. denied*, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); *Anthony P. Miller, Inc. v. United States*, 161 Ct.Cl. 455, 472, 1963 WL 8526 (1963); *Clemmer Constr. Co. v. United States*, 108 Ct.Cl. 718, 721, 71 F.Supp. 917, 919 (1947).

In the instant case, the defendant asserts the sovereign acts doctrine as a defense to the claims brought by the plaintiff regarding the alleged rights of access to the permit property. *See O'Neill v. United States*, 231 Ct.Cl. 823, 826 (1982) ("[E]xistence of the sovereign act defense necessarily turns on the nature and circumstances of each such act."). Although this Court finds no liability for breach of warranty or breach of the implied duties for the interruption of access to the permit property, as described above, this Court nevertheless affirms application of the sovereign acts doctrine to the circumstances of this case. As noted above, the sovereign acts doctrine applies to public and general Government acts. Indeed, what could comprise a more public and general act than the construction of a federal highway on federal land? Apparently, the plaintiff concedes this point. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 6 ("There is no question that the decision to reconstruct the road was a sovereign act taken in the national interest to provide access to the Coronado National Forest and had public and general application."). While admitting that the road reconstruction and improvement constitute a sovereign act, the plaintiff challenges only the daytime road

closure schedule as being unreasonable and subject to judicial scrutiny. Thus, by challenging only a single facet of the Government act, the plaintiff infers that the methodology for establishing the daytime road closure schedule be contrasted and separated from the overall decision to reconstruct and improve the General Hitchcock Highway.

This Court finds, however, that the sovereign acts doctrine, if applicable, applies to all aspects of the Government act. *See, e.g., D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 597, 372 F.2d 505, 507, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). Here, as the plaintiff admits, the reconstruction and improvement of the General Hitchcock Highway constitutes a sovereign act. As such, all the corresponding facets of that Government action likewise comprise a sovereign act. If this Court allowed the plaintiff to attack a single aspect of the action, such as the road closure schedule, this disintegration of the doctrine would subvert the justification for the precept. What would be next: where the engineers choose to locate the highway, when the majority of construction or demolition should take place, how the excavation crew should prosecute the blasting, or what process to use in transporting fill? While facially dubious, in challenging the daytime road closure schedule, the plaintiff in fact seems to challenge all of these aspects of the highway construction process. This Court, however, denies the plaintiff the opportunity to dissect this sovereign act. The subject road reconstruction and improvement comprise a sovereign act of public and general nature, as even admitted by the plaintiff, and this Court finds no authority for reviewing every minor decision that is made in implementing the sovereign act at issue.

▬ Moreover, even were this Court to allow the plaintiff to challenge a single aspect of a sovereign act, the plaintiff nonetheless proves the defendant's case as to the public and general nature of the single aspect in question, or the daytime road closure schedule. In order to disprove the public and general application of the sovereign act in question, the plaintiff contends: "[T]he decision to permit daytime road closures benefit-ted only the contractor, Mountain Gravel, *excluded the public from the Coronado National Forest,* and has caused significant *economic damage to the plaintiff and other businesses* on the mountain." Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 6–7 (emphasis added). This statement, however, demonstrates that the road closure schedule indeed constituted a sovereign act. For, the "exclusion of the public from the Coronado National Forest" applies not solely to the plaintiff but to the entire *public,* and the "economic damage to the plaintiff and other businesses" applies not solely to Dawgie but to "other businesses" in *general.* Thus, the nature of the act in question not only comprises a public and general action, but the action precludes a principal and primary focus upon the plaintiff. *See J.B. McCrary Co. v. United States,* 114 Ct.Cl. 12, 34, 84 F.Supp. 368, 370 (1949) (contrasting an order of general application with an order applying to a single individual). Therefore, as based on the plaintiff's own admissions, this Court arrives at the inescapable conclusion that the daytime road closure schedule for the General Hitchcock Highway comprises a public and general act of the Government and thus constitutes a sovereign act.

▬ Finally, even if the road closures constituted sovereign acts, the plaintiff contends that the permits contemplated compensation therefor. Generally, however, absent a contractual agreement to compensate for a sovereign act, no liability arises for such actions under the sovereign acts doctrine. *Winstar Corp. v. United States,* 994 F.2d 797, 808 (Fed.Cir.1993); *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). Yet, if the Government chooses, the Government may agree to compensate a contractor for losses incurred by sovereign acts. *D & L Constr. Co. & Assocs. v. United States,* 185 Ct.Cl. 736, 752, 402 F.2d 990, 999 (1968) ("It has long been established that while the United States cannot be held liable directly or indirectly for public acts which it performs as a sovereign, the Government can agree in a contract that if it does exercise a sovereign power, it will pay the other contracting party the amount by which its costs are increased

**134**

by the Government's sovereign act, and that this agreement can be implied as well as expressed."). The basis for this compensation relies on the implied duty of good faith and fair dealing. *See generally* Richard E. Speidel, *Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts*, 51 GEO.L.J. 516 (1963) (examining the role of the implied duties in limiting the sovereign acts doctrine). As described above, however, to prevail on a claim of denial of access based on an implied duty to cooperate or an implied duty not to hinder performance, the Government must have warranted or guaranteed such access. *See Freedman v. United States*, 162 Ct.Cl. 390, 402, 320 F.2d 359, 366 (1963) ("[The sovereign acts doctrine] does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused."). In the instant case, the plaintiff points to no contractual provision stating or inferring a right to unlimited and uninterrupted access to its ski facilities via the General Hitchcock Highway. Indeed, had such provision existed, the sovereign acts doctrine would not extend so far. *See Ottinger v. United States*, 116 Ct. Cl. 282, 285, 88 F.Supp. 881, 883 (1950) ("We think that when agents of the Government, without justification in statute, executive order, administrative discretion or otherwise, engage in conduct which is a violation of an express or implied provision of a Government contract, the mantle of sovereignty does not give the Government immunity from suit."). Yet, again as noted above, the plaintiff evidences no such contractual provision. Resultingly, in the absence of contrary agreement, the sovereign acts at issue obviate any claim by the plaintiff.

In conclusion, this Court finds the plaintiff's case devoid of any factual or legal basis for the denial of summary judgment relating to the daytime road closure schedule for the General Hitchcock Highway during the period of road reconstruction and improvement. As evidenced in the briefs and other submitted documents and as demonstrated in the lengthy recitation of facts, the Federal Highway Program agencies dedicated substantial time and resources toward developing a fair and organized traffic control system during the road reconstruction and improvement process. In addition, the various agencies kept the plaintiff well abreast of the developments in establishing the daytime road closure schedules, and the plaintiff apparently helped to develop at least some of the schedules. Finally, similar to the decision to reconstruct and improve the highway, the decisions relating to road closures encompassed public as well as general acts. Accordingly, for the foregoing reasons, this Court concludes that the reconstruction and improvement project for the General Hitchcock Highway (including the daytime road closure schedule) constituted sovereign acts.

CONCLUSION

In the complete absence of express or implied contract language relating to the provision of access to the permit property occupied by Dawgie, this Court finds no breach of express warranty, implied warranty, or the implied duty of good faith and fair dealing relating to the right of access to Mount Lemmon Ski Valley. Furthermore, because the prosecution of road reconstruction and improvement, especially upon federal lands, constitutes public and general acts of the Government, this Court finds liability neither for these acts nor for the delays pursuant to the daytime road closure schedule at issue. Therefore, for the foregoing reasons, this Court renders summary judgment in favor of the defendant, and the plaintiff's complaint will be dismissed.

Each party is to bear its own costs.